## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**TAMARA S. CRIBLEY,**

      **Plaintiff,**

**vs.**                        **Case No.: 4:11cv00459-CAS**

**MICHAEL J. ASTRUE,**
**Commissioner of the**
**Social Security Administration,**

      **Defendant.**

_____/

## MEMORANDUM OPINION AND ORDER

This is a Social Security case referred to the undersigned U.S. Magistrate Judge upon consent of the parties and reference by District Judge Stephan P. Mickle.  Doc. 14.  *See* Fed. R. Civ. P. 73; 28 U.S.C. § 636(c).  After careful consideration of the entire Record, the decision of the Commissioner should be affirmed.

## I.  Procedural history

On April 30, 2007, Plaintiff, Tamara S. Cribley, filed a Title II application for Disability Insurance Benefits, alleging disability beginning March 28, 2006.  R. 127.  (Citations to the Record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)  At hearing, Plaintiff amended her onset date to September 18, 2006.  *Id.* at 17, 53.  Her insured status for disability benefits ended on December 31, 2011.  *Id.* at 17, 19.

Plaintiff's application was denied initially on May 8, 2007, and upon reconsideration on November 28, 2007.  *Id.* at 17.  On November 28, 2007, Plaintiff filed a request for hearing.  *Id.* at 28-29.  On September 14, 2009, Plaintiff appeared and testified at a hearing conducted by Administrative Law Judge (ALJ) Lisa B. Martin.  Paul R. Dolan, an impartial vocational expert (VE), testified during the hearing.  *Id.* at 58-65, 105-06 (Resume).  Plaintiff was represented by James A. Kole, an attorney.  *Id.* at 17, 30.  On October 26, 2009, the ALJ issued a Decision denying Plaintiff's application for benefits.  Plaintiff filed a request for review and submitted a memorandum in support. *Id.* at 12-13, 391-92.  On June 6, 2011, the Appeals Council denied Plaintiff's request for review.  *Id.* at 1-7.  This appeal followed.  The parties filed memoranda of law, docs. 16 and 20, which have been considered.

## II.  Findings of the ALJ

In the written Decision issued October 26, 2009, the ALJ made several findings relative to the issues raised in this appeal:

1. Plaintiff was born on March 14, 1960, and was 46 years of age as of the onset date (September 18, 2006) and 49 at the time of the hearing. Plaintiff has at least a high school education (GED) and is able to communicate in English.  R. 25.

2. Plaintiff has not engaged in substantial gainful activity from her alleged onset date of September 18, 2006, through her date last insured of December 31, 2011.  *Id.* at 19.

3. Plaintiff has several "severe impairments: status post lumbar spinal surgery times 3, with chronic low back pain and radiculopathy, a cervical spine disorder, and degenerative changes of the right shoulder."  *Id.*

4. Plaintiff does "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.* at 22.

5. Plaintiff has the residual functional capacity (RFC) "to perform light work as defined in 20 CFR 404.1567(b): during a normal 8-hour work day, she can lift/carry 20 pounds occasionally and 10 pounds, frequently; [s]he can sit for up to 6 hours and stand/walk for up to 6 hours in an 8-hour work day, with an opportunity to change positions within her work station, as needed; she can occasionally perform overhead reaching functions with her right upper extremity and can do so without limitation with her left upper extremity; she occasionally can climb stairs and ramps, but not ropes, ladders or scaffolds; she can occasionally balance, stoop, kneel, crouch or crawl; hazards, such as heavy operating machinery and unprotected heights, should [be] avoided; she is limited to routine, uncomplicated work tasks due to pain." *Id.* at 23.

6. Plaintiff "is unable to perform any past relevant work." *Id.* at 25.

7. Transferability of jobs is not material to the determination of disability. *Id.*

8. "Considering [Plaintiff's] age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform," such as office helper, ticket seller, and mail clerk, all unskilled and light occupation jobs. *Id.* at 25-26.

## III. Issues to be determined

Whether the ALJ erroneously rejected the opinions of Plaintiff's treating physician/neurologist, Vildan Mullin, M.D.; whether the ALJ's credibility determination of Plaintiff is supported by substantial evidence; whether the ALJ appropriately explained the weight given to the evidence, including but not limited to the opinions of treating physicians; whether the ALJ's RFC findings are supported by substantial evidence; and whether an award of benefits is merited.

## IV.  Legal standards guiding judicial review

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); <u>accord Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[1]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'"  <u>Bloodsworth</u>, 703 F.2d at 1240 (citations omitted).

---

[1]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."  <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."  <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"  <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).

An ALJ has a basic duty to develop a full and fair record.  20 C.F.R. § 404.1512(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least 12 months preceding the month in which you filed your application."); Brown v. Shalala, 44 F.3d 931, 934 (11th Cir. 1995); *see also* Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir. 2003) (rejecting claimant's argument that the ALJ had a duty to develop the medical record for the time period after his application for benefits was filed).  "Nevertheless, the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim."  *Id.* at 1276. (citations omitted).

The Commissioner's regulations provide that an application remains in effect until the ALJ hearing decision is issued.  20 C.F.R. § 404.620(a); Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999) ("We review the decision of the ALJ as to whether the

claimant was entitled to benefits during a specific period of time, which was necessarily

prior to the date of the ALJ's decision.")

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)(4)(i)-

(v):

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or
equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have any impairments which prevent past
relevant work?

5.      Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in

disapproval of the application for benefits.  If a claimant has an impairment that is listed

in or equal to an impairment listed in Appendix 1, a finding of disability is made at step

three without considering the claimant's age, education, or work experience.  20 C.F.R.

§ 404.1520(d).  The disability determination is a sequential evaluation, with the step

three determination occurring before the determination of RFC and the ability to perform

past or other work based on the RFC determination.  20 C.F.R. § 404.1520(a)-(g).  A

positive finding at step three results in approval of the application for benefits.  At step

four, the claimant bears the burden of establishing a severe impairment that precludes

the performance of past relevant work.  Consideration is given to the assessment of the

claimant's RFC and the claimant's past relevant work.  If the claimant can still do past

relevant work, there will be a finding that the claimant is not disabled. If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience. Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 404.1520(a)(4)(v), (e), & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Furthermore, acceptable medical sources provide evidence in order to establish whether a claimant has a medically determinable impairment.  These medical sources include licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, and others.  20 C.F.R. § 404.1513(a).   In addition to evidence from the acceptable medical sources, evidence from other sources may be considered to show the *severity* of the claimant's impairment and how it affects their ability to work, and these other sources include nurse-practitioners.  *Id.* § 404.1513(d)(1).

When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, i.e., "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other

relevant but unspecified factors.  *Id.* § 404.1527(d).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).  This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips, 357 F.3d at 1241.  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor, 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory.  Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991).  Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so.  Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986).  Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own

medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."  Lewis, 125 F.3d a1436, 1440 (11th Cir. 1997); Edward, 937 F.2d at 583 (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)).

Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).

The credibility of the claimant's testimony must also be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain.  Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988).  After considering a claimant's complaints of pain, an ALJ may reject them as not credible.  See Marbury, 957 F.2d at 839 (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)).  If an ALJ refuses to credit subjective pain testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility.  See Wilson, 284 F.3d 1225.  Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.  Id.

Pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain.

One begins with the familiar way that subjective complaints of pain are evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

Wilson, 284 F.3d at 1225.  *See* 20 C.F.R §§ 404.1529 (explaining how symptoms and pain are evaluated); 404.1545(e) (regarding RFC, total limiting effects).  This is guidance for the way the ALJ is to evaluate the claimant's subjective pain testimony because it is the medical model, a template for a treating physician's evaluation of the patient's experience of pain.  Who else is better able to determine the existence of an underlying medical condition that can reasonably be expected to give rise to the claimed pain than the treating physician?  That is why it is so well-established that the treating physician's opinion as to the existence and effects of pain must be given substantial weight.  *See, e.g.*, Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1217 (11th Cir. 1991) (finding that opinion of treating physician that claimant suffers from disabling pain must be accepted as true).

It is true that an ALJ may credit subjective pain testimony even if objective evidence is lacking.  But this is merely permissive guidance.  It does not mandate belief in the subjective testimony where the substantial evidence in the record indicates otherwise.  After all, in making the credibility finding, the ALJ is directed to articulate the findings based upon substantial evidence.  Substantial evidence may consist of objective medical findings, a lack of other objective medical findings, evidence of

exaggeration, inconsistencies in activities of daily living, failure to pursue recommended physical therapy or to take prescribed medications, and the like.

The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 404.1529(c)(3)(i).   *But see* Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

## IV.  Relevant medical history

## A.  Testimony from the Evidentiary Hearing

### Tamara S. Cribley (Plaintiff)

Plaintiff resides in Chattahoochee, Florida, with her husband who works (she does not) and is the couple's source of income.  Plaintiff resumed receiving medical insurance in or around 2008 from her husband.  R. 35, 44, 367; *see infra* p. 13.

Plaintiff has a high school education and also received a diploma after completing a six-month secretarial college program.  *Id.* at 36.

Plaintiff discussed her employment history for the last 15 years beginning with working as a full-time office clerk (customer service, order entry, handle phone calls for parts) employed at Higden Furniture Company for four years.  This job did not require lifting and carrying.  *Id.* at 37-38, 122 (record of wages 1993-1997).  She then worked full-time for the Department of Corrections[2] (for nine and one half years) where she was

---

[2] The record of Plaintiff's wages indicates that she worked from 1997 through 2005.  *Id.* at 122-23.  Plaintiff earned approximately $10,000 in wages in 2006 from the

responsible for answering and forwarding phone calls, typing (on a typewriter and computer), date stamping mail and distributing the mail and overall "office type clerical duties." *Id.* at 36-38, 122-23 (record of wages-1997-2006). At times, she did significant lifting or carrying, but she could not lift anything heavy-she "tried to avoid that." *Id.* at 37. Plaintiff was terminated in 2006 "due to [her] back problems. [She] was in and out a lot." *Id.* at 19, 39.

Plaintiff clarified that she last worked *regularly* until March 2006 when she had a "disc slip and pinch that nerve and [she] could not walk period." *Id.* at 53. She last worked (onset date) on September 18, 2006, as clarified by Plaintiff's counsel. *Id.* at 51-53; *see* n.2. The ALJ found that Plaintiff had not engaged in substantial gainful activity since September 18, 2006, before Plaintiff's third surgery in December 2006. *Id.* at 19; *see id.* at 51.

Plaintiff had procedures performed on her back--a microdiskectomy and a fusion. According to Plaintiff, these procedures did not work so they performed a third one, "disc removal and fusion." *Id.* at 39. She stated she has not done well after the latter, fusion surgery and has not been back to work since that procedure "because she still has "complications from it." *Id.* She has "chronic nerve damage. Permanent nerve damage in [her] right leg and muscle loss." *Id.* at 39-40. She "still [has] chronic pain" down her "whole right side of [her] leg. All the way into [her] foot." *Id.* at 40. The pain is "pretty much constant" and there are times when it is worse. *Id.* Plaintiff says she

---

State of Florida. *Id.* at 123. Plaintiff worked at Gadsden Correctional Facility, Gretna, Florida, from July 15, 2006, through September 18, 2006. *Id.* at 131, 270. Plaintiff explained that she received $3,000 in 2007 from a disability policy. *Id.* at 51, 115-16.

cannot sit or stand for long periods of time.  Her pain is aggravated when riding in a car,

such as after a 45-minute drive from Chattahoochee to Tallahassee for the hearing.  *Id*.

It helps if she can move around.  *Id*.

After Plaintiff had her last MRI, she was told that she "had lots of scar tissue

there and degenerative disc above where [she] had [her] surgery."  *Id*. at 41.  There was

little they could do for her other than trying epidural injections or putting her in a spinal

cord stimulator.  *Id*.  Plaintiff was scheduled to receive another epidural injection on

October 12, 2009.  *Id*.

Plaintiff also described her neck problem, which is "constantly hurting [her]."  *Id*.

at 42.  Overall, she has problems with the right side of her body and has a bone cyst in

her shoulder.  *Id*. at 42, 56.  She has not had treatment for her shoulder.  *Id*. at 43.

Plaintiff was treated for depression in the past when she was working, but not

currently.  *Id*. at 43.

Plaintiff has been covered by insurance for the past year or so.  *Id*. at 44.  She

had not been taking pain medications as she has "just been dealing with it."  *Id*.  She

"didn't start, you know, really going back to see the doctors until a little while after [she]

got covered under [her] husband's insurance again."  *Id*.   She did not like taking pain

medication.  *Id*.  She had been on medication for a month before the epidural.  *Id*. at 44-

45.  As of the hearing, she takes Tylenol or BC powder, *id. at 45*, but no other pain

medication.  She has also taken muscle relaxants (Skelaxin and Flexeril) when she had

muscle spasms in her hip and they have been helpful, but she does not like to take too

many as she has a weak tolerance for these medications "[b]ecause they knock me out

pretty much." *Id.* at 45-46, 55-56.  As of the hearing, Plaintiff did not have any refills and had not asked her doctor for a refill because she decided to try an epidural on the 26th prior to the hearing. *Id.* at 40-41, 46.  She states she cannot take anti-inflammatory medication because of stomach problems.  Plaintiff also does not want to get "hooked on pain medicine." *Id.* at 55-56.

Plaintiff also has carpel tunnel syndrome on her right hand that was diagnosed around 2004. *Id.* at 46-47, 56.  She was ordered an arm brace to use at night when sleeping, which helps some. *Id.* at 47.

Plaintiff is right-handed. *Id.* at 57.  As a result of her carpel syndrome and problems with her shoulder and lifting (even shoulder level), Plaintiff states she cannot type on a computer for more than 20 minutes.  Her neck also gives her problems and she needs "to rest it sometimes." *Id.* at 57-58.

Plaintiff described her daily activities, which included general housework, without bending or "much squatting" (because of nerve damage to her right leg) or heavy lifting. She says she cannot bend over. *Id.* at 47-48.  She reports not having hardly any strength in her right leg. *Id.* at 48.  She cooks simple meals and does a lot of baking; she cannot stand for a long period, *id.* at 48-49, perhaps 15 to 20 minutes at a time. *Id.* at 54.  During the hearing, Plaintiff requested to stand because she "cannot sit for long periods of time." *Id.* at 53.  She does better when she gets up "within 15, 20 minutes." *Id.*

She spends the day "up and down," but she is most relaxed when "laying down." *Id.* at 56.  She takes breaks during the day to "lay on the couch or whatever."  *Id.*  If she lays in the bed too long, she gets up hurting.  *Id.*

Plaintiff drives, but she is in pain after driving for 30 minutes.  She has problems with her right side and accessing the gas and brake pedals and after sitting.  *Id.* at 49. Plaintiff rode to the hearing from Chattahoochee and stopped once and got out of the car.  *Id.* at 54.

Plaintiff visits with her parents who live within a block.  *Id.* at 49.  She attends church and attends a luncheon once a month.  *Id.* at 50.

At hearing, Plaintiff stated her back pain was probably a five on a ten-point scale. *Id.* at 54.  If she can take breaks between sitting and not standing too long, and without any bending or squatting, her pain is "around three."  *Id.* at 55.

**Paul R. Dolan (vocational expert (VE))**

Plaintiff's counsel stipulated to the credentials of Mr. Dolan.  *Id.* at 58-59. Mr. Dolan had no contact with the ALJ.  The ALJ asked Mr. Dolan to point out any discrepancies between his testimony and the Dictionary of Occupational Titles (DOT). *Id.* at 59.

Mr. Dolan reviewed Plaintiff's last relevant work and based on the Plaintiff's testimony, Mr. Dolan characterized Plaintiff's work as secretary and general clerk.  The ALJ asked Mr. Dolan the following hypothetical question:

> assume an individual with the claimant's age, education, and work background and for hypothetical number one, the individual would be limited to light lifting and carrying tasks and that would be no more than 20 pounds occasionally and 10

pounds frequently.  Can perform only occasional overhead reaching with her right shoulder.  Cannot perform ladder, rope or scaffold climbing.

Is limited to occasional postural motions and that's occasional ramp and stair climbing, balancing, stooping, kneeling, crouching, and crawling.  And is limited to—well, must avoid exposure to dangerous work hazards such as unprotected heights and exposed machinery.  And because of pain distractions will be limited to routine uncomplicated type of work tasks.

For hypothetical number one, could this individual perform any of the claimant's past work?

*Id.* at 60-61.  Based on this hypothetical, Mr. Dolan opined that such an individual would be able to go back to work as a general clerk as defined in the DOT, but not as performed and would not be able to go back to work as a secretary either as defined or as performed.  *Id.* at 61; *see id.* at 25 (ALJ concluding that Plaintiff is unable to perform past relevant work as a general clerk or secretary).

Mr. Dolan testified that such a hypothetical person could perform several jobs in the local or regional (in Florida) and national economy such as office helper, ticket seller, and mail clerk, all unskilled jobs (each with a SVP of 2), and light exertional occupations.  *Id.* at 62.  Mr. Dolan also opined that such a person could perform these jobs within the work station with the added condition that they be able to change positions as needed during the work day that might be every 20 minutes or the time necessary to take a stretch break or just standing up to change positions or sitting back down.  *Id.* at 63.  Mr. Dolan was also asked to consider whether such a person could perform the three jobs if the individual cannot perform constant or repetitive-type hand activities.  *Id.* at 63-64.  Mr. Dolan stated the handling restrictions for the three jobs

(ticket seller-constant; mail clerk and office helper-frequent) and stated that ticket seller "is outside that limit."  *Id.* at 64-65.

At the end of the hearing, Plaintiff's counsel argued that Plaintiff met Listing 1.04A with regard to her low back.  Counsel relied on Dr. Vildan Mullin's opinions, exhibit 16F, and Dr. J. True Martin's (EMG NCV) findings, "which show the chronic radiculopathy."  *Id.* at 65-66, 370-77; *see id.* at 391-92 (counsel's post-ALJ decision submission).

**B.  Examination, Treatment, and Consultative Notes and Reports between June 2004 and November 2007**

A June 29, 2004, cervical spine MRI identified a small central focal extruded disc at C5-6 with the central canal at that level at the lower limits of normal size.  *Id.* at 338. A right shoulder MRI identified mild degenerative changes and probable bone cyst. *Id.* at 339.

An April 6, 2005, EMG study indicated symptomatic right carpal tunnel syndrome involving sensory fibers.  *Id.* at 340-41.

On February 22, 2006, Dr. Williams prescribed Lortab for Plaintiff's low back pain, which had some mild tenderness to palpation.  She was already taking Tylenol. *Id.* at 215.

On March 28, 2006, Plaintiff again saw Dr. Williams for chronic back pain with acute flares of pain through the left side and sciatic area.  Plaintiff was taking Lortab, but reported it did not help.  Dr. Williams instructed Plaintiff to continue Lortab, topical

analgesic and heat, and provided a steroid injection with additional prescribed steroids. *Id.* at 213.

On March 30, 2006, Plaintiff sought emergency care for low back pain radiating through her left leg.  The clinical impression was lumbar strain.  She was prescribed Skelaxin and Percocet.  *Id.* at 201-05.

An April 4, 2006, lumbar spine MRI showed facet arthropathy without herniated discs or significant stenosis.  *Id.* at 230.

On April 5, 2006, Plaintiff was first seen by neurosurgeon Nicholas F. Voss, M.D., for ongoing low back and left hip and leg pain.  Patient notes indicate that "[t]he pain radiates to the posterior of the left hip and anterior shin over the dorsum of the foot.  She has had it for five weeks and there was no inciting event.  She works as a secretary."  *Id.* at 240.  Upon examination, Plaintiff had a positive femoral stress test on the left with some hyperthesia of the dorsum of her left foot with a diminished left knee reflex compared to the right.  Despite the MRI showing only subtle arthropathy, a foraminal disc on the left at L4-5 was deemed possible.  *Id.*  Conservative treatment including an epidural injection with prescription pain medication and muscle relaxers were prescribed.  Surgery was only being considered "as a last [resort]."  *Id.*

A May 4, 2006, myelography with X-ray showed minimum central undulation and slight ventral impression from L2 to L5-S1.  *Id.* at 228-29.  However, a follow-up lumbar spine CT scan identified a very far left lateral disc herniation at L4-5, of which a fragment extended into the left lateral recess and sub-pedicle level of L4.  It was noted that the problem was difficult to identify on the recent MRI, but the radiologist opined

"but I think [this is] a real finding on myelography CT," although it is not evident on the myelography without the CT scan.  *Id.* at 227; *see id.* at 228-29 (results of a lumbar myelography showing minimal ventral impression on the thecal sac from L2 to S1, otherwise unremarkable).

On May 16, 2006, Plaintiff reported the epidural injection did not help her pain, and Dr. D. Bruce Woodham, M.D., an associate with Dr. Voss, noted Plaintiff "seems to be in agony when she sits here" even with her leg elevated on pillows.  Dr. Woodham opined Plaintiff likely had an L4-5 lateral disk herniation; however, "[s]he cannot, I think, continue to be out of work.  If she cannot be well after this length of time, being out of work further will not help her."  *Id.* at 238.  He stated she could try a chiropractor and also offered "her again a microdiskectomy."  *Id.*

On May 23, 2006, Plaintiff underwent a microdiskectomy (also called a discectomy)[3] at L4-5 due to left-sided pain and an inability to walk without crutches.  *Id.* at 236.  A fairly large lateral disc herniation, which was impinging the nerve root, was discovered during surgery.  *Id.* at 268.

On June 21, 2006, Plaintiff saw Dr. Woodham and CRNP Jennifer Parrish for a post-op examination.  *Id.* at 237.  Plaintiff continued to complain of mid-low back and left hip pain at times, although she was getting better.  Plaintiff reported having "some mild low back pain and left hip pain at times."  *Id.*  Dr. Woodham "strongly encouraged [Plaintiff] to return to work," although Plaintiff did not feel she could perform her duties.

---

[3]  *See* <u>Dorland's Illustrated Med. Dictionary</u> 547 (32d ed. 2012).

He agreed Plaintiff could stay out of work one more month, but "[s]he must return to work after this time."  *Id.*

By July 11, 2006, Dr. Woodham found Plaintiff was dramatically improved (but "not yet well") and encouraged her to be active.  Plaintiff walked without crutches.  *Id.* at 236.  Plaintiff was not interested in physical therapy at this time as she wanted to try medication.  "She has a minimally positive straight leg raise on the left side.  No motor weakness.  Perhaps some mild difficulty with stepping out with the left leg, maybe some quads weakness but no quads reflex asymmetry.  No sensory abnormality."  Plaintiff was prescribed Medrol Dosepak and given some more pain medicines.  ("Medrol=GI upset- did not take," was handwritten on the July 11, 2006, patient note and dated August 16, 2006.  *Id.*)

On August 16, 2006, Plaintiff still had some persistent pain and giveaway although she was "neurologically perfect."  *Id.* at 235.  Plaintiff had good reflexes and good motor function and her straight leg raise was negative.  *Id.*  Her back pain had improved.  Dr. Woodham recommended that Plaintiff "have a refill on her medicines."  *Id.  See id.* at 212, 343 (August 10, 2006, note from the Family Medical Clinic: "Back pain has improved after Woodham in Dothan did the surgery.")

A September 5, 2006, lumbar spine MRI identified a recurrent large left paracentral disc herniation at L4-5, which had appeared since the previous study.  No other disc herniations or canal encroachment was seen at any other level.  *Id.* at 243.

On September 6, 2006, Plaintiff saw Dr. Woodham and based on the previous MRI, another decompression surgery was recommended.  *Id.* at 234.  Upon

examination, Plaintiff "may have a little bit of paresis, which is minimal, on the left side, but no other motor weakness, reflex asymmetry, and so forth." *Id.* Her "[s]ensory exam is okay." *Id.*

An October 19, 2006, a patient note from Dr. Woodham indicated that Plaintiff underwent a L4-5 diskectomy and a redo of that surgery on September 22, 2006. *Id.* at 233. Plaintiff reported "doing wonderfully until about two weeks ago. At that time she began experiencing burning and stinging in her left hip and leg." *Id.* Plaintiff had a normal motor, sensory and reflex examination. Plaintiff declined a trial of physical therapy. Plaintiff was given a prescription for Lyrica 50 mg and instructed to remain out of work until her follow up appointment in four weeks. *Id.* After a month, Plaintiff reported Lyrica did not help. *Id.*

In December 2006, Plaintiff was still having a significant amount of hip and leg pain, and was ready to proceed with surgery. Upon examination, Plaintiff had a positive straight leg raise on the left and a herniated disc was suspected. Dr. Woodham noted he would start with a diskectomy, but if they discovered recurrent disc herniation, they would have to perform an L4-5 posterior lumbar interbody fusion. *Id.* at 232.

On December 29, 2006, Plaintiff underwent an L4-5 lumbar interbody fusion operation due to severe lumbar spondylosis with stenosis, facet arthropathy, lateral recess stenosis, and foraminal stenosis. *Id.* at 245-47. The operative report noted significant facet arthropathy at 4-5 and significant ligamentum hypertrophy at 4-5 with significant stenosis. Dr. Woodham noted "a significant amount of epidural scar tissue

adherent to the dura" such that the neural foramen was completely obliterated with the scar tissue and disc material.  *Id.* at 246.

On January 2, 2007, Dr. Woodham noted the fusion surgery and that Plaintiff "has minimal numbness in the right foot, no neurological deficit, otherwise.  She is ambulatory" and ready for discharge.  *Id.* at 245 (patient note while Plaintiff in the hospital).

On February 22, 2007, Plaintiff returned to Dr. Woodham's office for her first post-operative examination.  She still had soreness of the lower back, although her severe hip and leg pain had resolved since surgery.  *Id.* at 231.

A patient note indicated Plaintiff was a "no show" for two visits to Dr. Woodham's office on May 23 and June 25, 2007.  A message was left with Plaintiff that no meds would be prescribed "until she comes in."  *Id.*

On April 30, 2007, Plaintiff filed her application for disability benefits with an onset date of March 28, 2006, which was amended during the hearing.  *See supra* p.1.

On July 23, 2007, Plaintiff was evaluated by a clinical psychologist, Lawrence V. Annis, Ph.D.  Plaintiff appeared uncomfortable and was adjusting her posture while seated.  *Id.* at 270.  Plaintiff stated she took prescribed pain medication until two and one half months ago but stopped because she was without money to purchase the medication.  She reported taking Tylenol "every now and then."  *Id.* at 269.  Dr. Annis diagnosed a mood disorder due to a general medical condition with anxiety and depressive features.  He opined "[a]t least some degree of depression is likely to continue so long as she is experiencing major physical problems."  *Id.* at 271.  Plaintiff's

mental condition was deemed an impediment to her ability to participate in social interactions requiring patience in difficult situations.  Furthermore, Plaintiff's depression and anxiety affected her "occupational achievement" and Dr. Annis opined Plaintiff "would probably not do well in occupations requiring frequent, protracted or demanding social interaction such as receptionist, restaurant server, cashier, or sales clerk.  Due to her distraction to physical and emotional factors, she should *presently* avoid employment at occupations requiring technical precision, driving, operating machinery, or contact with dangerous substances."  *Id*. at 271 (emphasis added).

On July 24, 2007, Plaintiff was examined by Carla M. Holloman, D.O., at the Commissioner's request.  *Id*.at 274.  She was taking Tylenol, which did not relieve her back pain and hip numbness and tingling.  Upon examination, straight leg raise testing was positive on the right in both standing and seated positions, although Plaintiff was able to do tandem walking and was able to stand from a seated position without difficulty.  Her gait was normal without the use of assistive devices.  Paravertebral tautness and tenderness was noted in the lumbosacral spine.  *Id*. at 275.  Plaintiff's range of motion was within the normal range.  Her grip and muscle strength are 5/5 throughout.  *Id*. at 275, 277-78.

On August 1, 2007, Dr. Thomas Peele, a non-examining State agency physician, opined Plaintiff could perform light exertional activity with occasional postural limitations. He noted Plaintiff's fusion surgery had a good result and she was not compliant with follow-up treatment.  *Id*. at 279-86.

On August 2, 2007, Jane Cormier, Ph.D., a non-examining State psychologist, also deemed Plaintiff's mental impairment not severe. *Id.* at 287, 299. Functional limitations were none to mild. *Id.* at 297.

Plaintiff was involved in a single car automobile accident on August 6, 2007. Cervical spine X-rays taken at that time indicated degenerative changes at C3-4 and C4-5. *Id.* at 301, 313.

On November 1, 2007, David Guttman, M.D., a second non-examining State agency physician, opined Plaintiff could perform medium exertional activity without limitation. *Id.* at 315-22.

On November 5, 2007, according to Thomas Conger, Ph.D., a second non-examining State psychologist, Plaintiff's mental impairment was again deemed non-severe. *Id.* at 323.

The Record does not contain examination or treatment medical records for Plaintiff from approximately July 2007 until April 2009. *See id.* at 21 and doc 16 at 6. Plaintiff explained that she did not return to the doctors until after she was covered under her husband's insurance, *id.* at 44, although there is no evidence that Plaintiff sought and was denied medical care because of her inability to pay.

**C. Examination, Treatment, and Consultative Notes and Reports between April 2009 and September 2009**

On April 6, 2009, Plaintiff sought urgent care treatment after four or five days of back muscle spasms with a flare up of sciatica symptoms. Dr. Tiffani Magee reported that Plaintiff had no numbness and tingling in her feet, but occasional pain going down

into her right leg.  Plaintiff reported coughing for about four to five days.  A back examination showed good range of motion with lateral rotation and forward flexion of her torso with negative straight leg raise bilaterally.  Plaintiff's gait was normal and no neurological deficits noted.  A Prednisone taper and Skelaxin were prescribed.  *Id.* at 361-62.

Plaintiff resumed treatment ("essentially a new patient") with the Family Medical Clinic in May 2009 when she received insurance again.  *Id.* at 367.  She complained of chronic back pain and a steroid injection was provided.  *Id.* at 366-68.  On May 26, 2009, ARNP Abby Strickland noted, in part, "BACK-she has some mild lumbosacral discomfort.  Palpation along spine is not particularly painful to her.  Flexing and extending causes some pain.  When she has the radicular pain, it seems to be more down the right side, but none today."  *Id.* at 366.

In May and July 2009, Plaintiff's primary care provider, Family Medical Clinic, was attempting to find a new neurologist to evaluate Plaintiff's chronic back pain, "with new onset radiculopathy."  *Id.* at 364.  It is noted: "apparently whoever we set her up with, she has an issue with and wanted to see a different group.  She requests Dr. True Martin and Dr. Ayala in Tallahassee so we will redirect the referral there."  *Id.*

On July 31, 2009, Plaintiff was evaluated by neurologist Ricardo Ayala, M.D. Plaintiff complained of low back pain, extending from the right extremity down to her feet, despite three different back surgeries.  It was also noted: "No particular weakness but some days can be difficult for walking."  *Id.* at 381.  Plaintiff was not taking any

particular medicine at this time. *Id.* Muscle spasms were noted. *Id.* at 383. Antalgic[4] gait was noted and strength in the upper and lower extremities was normal. Normal sensation to pin prick in the upper and lower extremities was noted. Deep tendon reflexes in the upper and lower extremities was normal bilaterally. *Id.* at 384. Dr. Ayala opined that Plaintiff had chronic lumbar back pain. His plan was to proceed with an MRI of the lumbar sacral spine and an EMG of the right lower extremity and also to make a referral to the pain clinic for further assessment and treatment. *Id.* at 385.

An August 6, 2009, impression from a lumbar spine MRI with and without contrast indicated slight canal and foraminal narrowing with slight Grade 1 spondylolisthesis at L4 on L5. Conus medullaris appears normal and no compression fractures were seen. *Id.* at 386.

On August 12, 2009, Plaintiff underwent an initial consultation (at the request of Dr. Ayala) by neurologist, Vildan Mullin, M.D., Tallahassee Neurological Clinic, Department of Neurosurgery, Division of Pain Management, for low back pain, with both pain and numbness radiating into her right leg and with some lesser numbness on the left side. *Id.* at 370. (This was the only time Plaintiff was examined by Dr. Mullin.) Dr. Mullin was aware of Plaintiff's three surgeries in 2006. *Id.* Although her back pain decreased somewhat after the surgeries, Plaintiff reported her leg pain and symptoms had increased and also stated she was not taking medication at this time for pain, which was worsened by walking, sitting for long periods of time, driving, and standing for long

---

[4] "Antalgic" means: "1.  counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." Dorland's Illustrated Med. Dictionary 97 (32d ed. 2012).

periods of time.  *Id*.  Plaintiff described her pain "as continuous aching, shooting, burning, numb, stabbing, miserable, tiring and is at its worse all day."  *Id*.  Plaintiff described her pain on a one to ten-point scale, and on average it was a four, with one being no pain. *Id*. at 370.   It is noted that her pain is made better by medication, sleeping, and heat, although effectiveness of medication is rated as a one on the same scale.  *Id*. at 370-71.

After examination, Dr. Mullin noted under physical exam: "facet loading lumbar negative R and facet loading lumbar negative L. patient has very painful flexion and extension of the lumbar spine."  *Id*. at 373.  He also noted: "no masses, thyromegally, or abnormal cervical nodes" regarding the neck and "no clubbing, cyanosis, edema, or deformity noted with normal full range of motion of all joints."  *Id*.

Under lumbosacral exam, inspection-deformity and palpation-spinal tenderness are normal; forward flexion is 60 degrees and hyperextension is 5 degrees regarding range of motion.  Plaintiff had a positive right straight leg raise while lying (supine), but negative while sitting; a negative left straight leg raise while lying and sitting; right sciatic notch tenderness; and abnormal right toe and heel walking and normal on the left.  *Id*. at 374.

Under motor exam, gait, station, and posture were normal.  No paraspinal muscle spasm was noted as well as normal muscle tone in upper and lower extremities. Decreased strength in the right lower extremity (RLE) was noted.  *Id*. at 374.

Under sensory exam (sensation to pin), decreased sensation at right L4 and right L5 was noted, but under light touch, there was no evidence for sensory loss.  *Id*. at 374-

75.  Under reflex exam, deep tendon reflexes in the upper and lower extremities are normal bilaterally.  *Id.* at 375.

Dr. Mullin's impression was: chronic right-sided low back and leg pain secondary to postlaminectomy and failed back syndrome, with MRI evidence of fusion, degenerative disease, and scarring from previous surgeries.  *Id.* at 375.  The doctor recommended an epidural steroid injection, and if this failed, Dr. Mullin opined "the only other option would be to do [a] spinal cord stimulator implant trial."  Dr. Mullin further stated "[i]t would be very doubtful that she can have gainful employment which requires bending lifting prolonged standing and walking."  *Id.*  Lortab was prescribed.  *Id.*

On August 13, 2009, Plaintiff had a lower electromyographic exam (EMG) at the Tallahassee Neurological Clinic.  *Id.* at 376-77.  The exam was performed by J. True Martin, M.D.  Dr. Martin's impression is: abnormal study: chronic right lower back radiculopathy-no active denervation.  *Id.* at 377.

On September 1, 2009, Plaintiff was re-examined by Dr. Ayala.  *Id.* at 387. Dr. Ayala noted the EMG suggested chronic right L5 radiculopathy without active denervation.  *Id.*; *see id.* at 377.  Dr. Ayala noted "facet loading lumbar negative R and facet loading lumbar negative L. patient has very painful flexion and extension of the lumbar spine"; decreased right lower extremity strength, and decreased right L4 and right L5 sensation to pin, but no evidence for sensory loss with light touch.  *Id.* at 389-90.  Gait, station, and posture were normal.  There were no paraspinal muscle spasms and muscle tone in the upper and lower extremities was normal.  *Id.* at 390.  Dr. Ayala

noted the considerations for treatment were whether epidural injections or a spinal cord stimulator would be best.  *Id*. at 390.

On September 18, 2009, Dr. Mullin checked the line on a form that Plaintiff's condition met Listing 1.04A or is equivalent in severity to Listing 1.04A.  *Id*. at 379. Dr. Mullin did not set forth the medical basis for this conclusion in the space provided. *Id*.

## V.  Legal analysis

### A.  ALJ's Rejection of Plaintiff's Proof of Listing

Plaintiff argues that the ALJ erroneously rejected the opinion of Dr. Mullin regarding Listing 1.04A.  Plaintiff also argues that Plaintiff met Listing 1.04B, a point not argued before the ALJ, *id*. at 65-66, 391-92, but discussed in Plaintiff's memorandum. Doc. 16 at 9-13.

The third-step of the five-step process requires the ALJ to compare the claimant's medical evidence to a list of impairments "presumed severe enough to preclude any gainful work."  Sullivan v. Zebley, 493 U.S. 521, 525 (1990).  If the medical evidence meets or equals the listing, then a finding of disability is made.  *Id*.  The claimant's impairments must meet or equal *all* of the specified medical criteria in a particular listing for the claimant to be found disabled at step three of the sequential evaluation process. *Id*. at 530-31.

The burden is on the claimant to prove that she is disabled.  Bell v. Bowen, 796 F.2d 1350, 1352 (11th Cir. 1986) (citing 20 C.F.R. §§ 404.1525, 404.1526); Wilkinson v. Bowen, 847 F.2d 660, 663 (11th Cir. 1987).  To meet a listing, the claimant must show

she has been (1) diagnosed with a condition included in the listings and (2) present specific medical findings that meet the various tests listed under the description of the applicable impairment.  Bell, 796 F.2d at 1353.  A diagnosis alone is insufficient.  20 C.F.R. § 404.1525(d) ("To meet the requirements of the listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing."). Nevertheless, if the claimant has been diagnosed with a condition described in the listings, but is unable to provide medical evidence that meets all the criteria, she may still qualify for the particular listing if there are other findings related to the impairment(s) that are at least of equal medical significance to the required criteria.  Wilkinson, 847 F.2d at 662; 20 C.F.R. § 404.1526(b).

The ALJ does not need to "mechanically recite the evidence" leading to the determination that the claimant's impairments do not meet the listing criteria. Hutchinson v. Bowen, 787 F.2d 1461, 1463 (11th Cir. 1986).  In other words, the ALJ's listing determination need not be explicitly stated, but may be found implicitly in the ALJ's decision, even if the ALJ goes to the fourth and fifth steps of the disability analysis.  *Id.*

To meet Listing 1.04A or B, Plaintiff must show a disorder of the spine and meet or equal the following criteria:

1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with

associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours.[5]

The ALJ found that Plaintiff had several impairments: "status post lumbar spinal surgery times 3, with chronic low back pain and radiculopathy, a cervical spine disorder, and the degenerative changes of the right shoulder." R. 19.  In making this determination, the ALJ reviewed relevant medical records, including but not limited to Dr. Mullin's August 12, 2009, examination notes of Plaintiff as well as Dr. Mullin's September 18, 2009, check-off form in which Dr. Mullin indicated that Plaintiff met and equaled Listing 1.04A. *Id.* at 21.

After discussing the relevant medical evidence associated with Plaintiff's severe impairments, *id.* at 19-22, the ALJ rejected Dr. Mullin's "opinion [regarding Listing 1.04A] as being inconsistent with the other more medically reliable evidence of record, MRI findings, Dr. Mullin's opinion of 8/6/09 (Exhibit 18F/7) and Dr. Ayala's opinion of chronic low back pain (Exhibit 18F/8-11).  There is no evidence of atrophy, and no evidence that the claimant is unable to ambulate effectively.  Thus, there is no medical basis for a finding under listing 1.04." *Id.* at 21; *see id.* at 22 for a brief, but similar explanation for

---

5   The Commissioner substantially revised the musculoskeletal listing of impairments, effective February 19, 2002.  66 Fed. Reg. 58010 (Nov. 19, 2001).

the ALJ's rejection of Plaintiff's claim; *id.* at 24 (for additional references to patient notes of Drs. Ayala and Magee).  *See* <u>Phillips</u>, 357 F.3d at 1240.

Dr. Mullin examined Plaintiff on one occasion -- August 12, 2009.  *Id.* at 21, 370-75.  Dr. Mullin performed several examinations of Plaintiff, including a physical exam, detailed/spine exam, lumbosacral exam, detailed neurologic exam, and reflex exam.  *Id.* at 373-75.  Plaintiff was not taking any pain medications nor had any recent physical therapy when she was examined by Dr. Mullin.  *Id.* at 370.

Dr. Mullin determined that Plaintiff had chronic lower back pain with radiculopathy and noted: "Chronic right-sided of low back and leg pain secondary to post laminectomy and failed back syndrome.  Patient's MRI revealed fusion, degenerative disease and scarring from previous surgeries."  *Id.* at 375.  (On September 1, 2009, Dr. Ayala reached a similar conclusion identifying Plaintiff's number one problem as chronic low back pain.  *Id.* at 387-390; *see also id.* at 381-85 (Dr. Ayala's July 31, 2009, examination and reported similar conclusion).  Part of Dr. Mullin's impressions and recommendations included the following: "As far as working condition concern[, i]t would be very doubtful that she can have gainful employment which requires bending lifting, prolonged standing and walking."  *Id.* at 375.

Dr. Mullin noted that Plaintiff had a normal full range of motion of all joints and a negative facet loading lumbar (left and right), although Plaintiff "has very painful flexion and extension of the lumbar spine."  *Id.* at 373.  Dr. Mullin also noted the following: normal gait, station, and posture; no paraspinal muscle spasm; normal muscle tone in her upper and lower extremities; right sciatic notch tenderness; no evidence for sensory

loss to a light touch, although decreased sensation to pin at right L4 and L5 and

decreased strength in the right lower extremity, but the extent is unstated; and normal

deep tendon reflexes in the upper and lower extremities.  *Id.* at 374-75.  Plaintiff's range

of motion was 60 degrees (forward flexion) and 5 degrees (hyperextension).  Dr. Mullin

also noted "patient has very painful flexion and extension of the lumbar spine," but did

not expressly explain the relationship of these findings to his other finding regarding

Plaintiff's inability to work.  *Id.* at 373-75.  *Compare* Dr. Holloman's July 24, 2007, range

of motion measurements for Plaintiff's lumbar spine for passive motion: 90, 25, and 25

degrees for forward flexion, extension, and lateral flexion, respectively, right and left.  *Id.*

at 277.

Dr. Mullin noted that toe and heel walking was abnormal on the right, but he

provided no further explanation.  *Id.* at 374.  Dr. Mullin's notes do not indicate that

Plaintiff suffered motor loss (atrophy with associated muscle weakness or muscle

weakness alone) *accompanied* by sensory or reflex loss, although he did find

decreased right L4 and L5 sensation to pin, but no evidence for sensory loss to light

touch.  R. 374-75.[6]  Dr. Mullin performed a physical exam of Plaintiff's neck that

revealed no masses, thyromegally or abnormal cervical nodes.

---

[6]  "Inability to walk on the heels and toes, to squat, or to arise from a squatting
position, when appropriate, may be considered evidence of significant motor loss."  20
C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00E1; *see* 66 Fed. Reg. 58010, 58018 (Nov. 19,
2001) ("We also clarified in final 1.00E1 what we mean by 'motor loss'-that is, atrophy
with associated muscle weakness, or muscle weakness alone.  Atrophy in the absence
of muscle weakness is not evidence of motor loss.  We explain in final 1.00E, discussed
earlier, what we require to show atrophy.")  As stated above, as part of the motor exam,
Dr. Mullin noted Plaintiff's gait, station, and posture are normal; no paraspinal muscle

Dr. Mullin recommended a causal epidural steroid injection and also prescribed Lortab.  *Id.* at 375.

An August 13, 2009, EMG (performed by Dr. Martin) confirmed the diagnosis of chronic right lower back radiculopathy, but no active denervation.  *Id.* at 376-77; *see id.* at 387 (Dr. Ayala noting after Plaintiff's follow-up visit on September 1, 2009, the EMG exam with no active denervation).

Dr. Mullin did not make specific findings that Plaintiff has a disorder of the spine that resulted in "compromise of a nerve root (including the cauda equina) or the spinal cord" *with* "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain" that was "accompanied by sensory or reflex loss *and*, if there is involvement of the lower back (as there is here), positive straight-leg raising test (sitting *and* supine)." (emphasis added).[7]  Dr. Mullin noted that Plaintiff had a *positive* (right) straight leg raise when *lying* (supine), but a *negative* (right) straight leg raise when *sitting*.  *Id.* at 374.

---

spasm; normal muscle tone in upper and lower extremities; but decreased strength in right lower extremity (RLE) and decreased sensation to pin (right L4 and L5), but no evidence of sensory loss to light touch.  *Id.* at 374-75; *see also id.* at 390 (Dr. Ayala's similar assessment).

[7]  "[T]he final listing does require 'neuro-anatomic distribution' of pain to make clear that the nerve root compression would have to be reasonably expected to cause the pain."  66 Fed. Reg. 58010, 58018 (Nov. 19, 2001).  "Nerve root compression results in a specific neuro-anatomic distribution of symptoms and signs depending upon the nerve root(s) compromised."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00K1.

Further, regarding Listing 1.04B, Dr. Mullin does not mention nor does Plaintiff's medical evidence confirm that Plaintiff has "spinal arachnoiditis."[8]

The ALJ's ultimate rejection of Dr. Mullin's (met or equaled) impairment rating under Listing 1.04A is supported by substantial evidence.  Also, Plaintiff did not prove that Plaintiff's albeit severe impairments, *id.* at 19, met or equaled the specific medical criteria under Listing 1.04B.  *See generally* Sullivan, 493 U.S. at 530; *see also* Miller v. Astrue, No. 2:02-cv-650-FtM-DNF, 2011 U.S. Dist. LEXIS 46325, at *15-16 (M.D. Fla. Apr. 28, 2011); Majkut v. Astrue, No. 8:07-cv-1828-T-MCR, 2009 U.S. Dist. LEXIS 30049, at *28-29 (M.D. Fla. Mar. 30, 2009), *aff'd*, 660 F. App'x 660 (11th Cir. 2010).

### B.  ALJ's Credibility Determination

Plaintiff also contends that the ALJ's credibility determination regarding Plaintiff is not supported by substantial evidence.  Doc. 16 at 13-15.  The ALJ properly discounted

---

[8] "Spinal arachnoiditis is a condition characterized by adhesive thickening of the arachnoid which may cause intermittent ill-defined burning pain and sensory dysesthesia, and may cause neurogenic bladder or bowel incontinence when the cauda equina is involved." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00K2a.  (Plaintiff denied having any abnormal bowel or bladder functions.  *Id.* at 370.)  "Although the cause of spinal arachnoiditis is not always clear, it may be associated with chronic compression or irritation of nerve roots (including the cauda equina) or the spinal cord.  For example, there may be evidence of spinal stenosis, or a history of spinal trauma or meningitis.  Diagnosis must be confirmed at the time of surgery by gross description, microscopic examination of biopsied tissue, or by findings on appropriate medically acceptable imaging.  Arachnoiditis is sometimes used as a diagnosis when such a diagnosis is unsupported by clinical or laboratory findings.  Therefore, care must be taken to ensure that the diagnosis is documented as described in 1.04B.  Individuals with arachnoiditis, particularly when it involves the lumbosacral spine, are generally unable to sustain any given position or posture for more than a short period of time due to pain."  *Id.* at § 1.00K2b.

Plaintiff's credibility because the objective medical evidence does not support Plaintiff's allegations of disability.

The records showed Plaintiff underwent three back surgeries in 2006. *Id*. at 20, 231-46. In May 2006 and September 2006 (the month of her amended alleged onset date), Plaintiff underwent two microdiscectomies at L4-L5. *Id*. at 20, 233, 236, 238. In December 2006, Plaintiff underwent a lumbar fusion at L4-L5. *Id*. at 20, 245-46. In February 2007, Plaintiff "states she does have some soreness across the lower back, but her severe hip and leg pain have resolved since surgery." It is noted that Plaintiff "has a normal motor, sensory and reflex exam today." *Id*. at 231.[9]

In July, 2007, Dr. Holloman examined Plaintiff (at the Commissioner's request). *Id*. at 275-78. Plaintiff was taking Tylenol, which did not relieve her back pain and hip numbness and tingling. Upon examination, straight leg raise testing is positive on the right in both standing and seated positions, although she is able to do tandem walking and was able to stand from a seated position without difficulty. Her gait is normal without the use of assistive devices. Paravertebral tautness and tenderness is noted in the lumbosacral spine. *Id*. at 275. Plaintiff's range of motion was within the normal range. Her grip and muscle strength are 5/5 throughout. *Id*. at 20, 275, 277-78.

In August 2007, Dr. Peele opined Plaintiff could perform light exertional activities with occasional postural limitations. He noted Plaintiff's fusion surgery had a good result and she was not compliant with follow-up treatment.

---

[9] On April 30, 2007, Plaintiff filed her application for disability benefits. R. 17.

In November 2007, Dr. Guttman opined Plaintiff could perform medium exertional

activity without limitation.  *Id.* at 21, 315-22.

As noted previously, except for one emergency room visit after a motor-vehicle

accident on about August 6, 2007, *id.* at 301, 313, the Record does not contain

examination and treatment medical records for Plaintiff from approximately July 2007

until April 2009.

Plaintiff argues "[f]or a period of time, Plaintiff was unable to obtain other

treatment, however, once she was able to resume treatment, it was noted that her

treatment options were essentially exhausted."  Doc. 16 at 13-14.  Nevertheless, in July

2007, Plaintiff told Dr. Annis that "she took prescribed pain medication until 2 1/2 months

ago and stopped because she had no money to purchase it.  She reports now taking

Tylenol "every now and then."  R. 269.

There is no evidence Plaintiff sought examination and treatment and was

deprived of same during this almost two-year period because of an inability to pay or for

lack of health insurance.  *See* Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005)

("However, there is no evidence Goff was ever denied medical treatment due to

financial reasons."); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (explaining that

alleged pain and disability are inconsistent with failure to seek low-cost or no-cost

medical treatment).

In April 2009, Plaintiff saw Dr. Magee, complaining of lower back spasms for the

past four or five days.  *Id.* at 21, 362.  Plaintiff said she had a history of back surgery a

few years ago and "just recently had a flare up."  *Id.*  The physical examination was

normal as Plaintiff had no neurological deficits.  *Id.*

In August 2009, a MRI of the lumbar spine showed minimal findings, including a slight canal and foraminal narrowing and a slight grade 1 spondylolisthesis of L4 on L5, and an EMG showed chronic right lower back radiculopathy, but no active denervation. *Id.* 21, 376-77, 386.  Physical examinations in August and September 2009 report Plaintiff's described pain and impressions of Plaintiff's chronic lower back pain, but aside from a few exceptions set forth herein, and Dr. Mullin's Listing opinion, the reports support the ALJ's determinations.

The ALJ determined that Plaintiff has severe impairments, including chronic back pain.  R. 19.  The ALJ referred to Plaintiff's complaints of pain to examining and treating physicians.  *Id.* at 19-21, 23-24.  The ALJ gave "greater weight" to the reports and opinions of these physicians.  *Id.* at 24.

The ALJ also expressly rejected the extent of Plaintiff's complaints of pain after considering her live testimony and medical and other evidence.  *Id.* at 23-24.

Plaintiff complains that the ALJ improperly considered evidence that Plaintiff went for long periods of time without taking any medication or only took over-the-counter medication for pain.  Doc. 16 at 13-15.  The ALJ considered Plaintiff's testimony noting, in part, that Plaintiff "did not like taking pain medication, as she did not want to become addicted.  So she took only Tylenol and BC powder for pain relief."  *Id.* at 23.

Plaintiff testified that she did not take pain medication because of side effects, *id.* at 23, 41, 44-46, 55-56, although she did not generally complain about side effects to her physicians.  In her memorandum, Plaintiff states that she had a "weak tolerance" to

the muscle relaxers; that she did nor "want to be hooked on pain medication"; and that she "was concerned about medications because anti-inflammatories exacerbated her stomach problems. *See* (R. 232) (acid reflux disease)." Doc. 16 at 14.[10]  However, the citation to (R. 232) is to a December 6, 2006, note from Dr. Woodham indicating that Plaintiff "has acid reflex disease currently." *Id*.  There was no mention that this condition was caused by using pain medication. *Id*.  A February 22, 2007, note signed by CRNP Parrish for Dr. Woodham makes no reference to Plaintiff having acid reflux. *Id.* at 231. *But see id.* at 236 (August 16, 2006, handwritten notation reporting "Medrol=GI upset-did not take.")  *See* Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) ("We also think that it was reasonable for the ALJ to consider the fact that no medical records during this time period mentioned Mr. Depover having side effects from any medication.").  On the other hand, although Plaintiff stated that some medications were not effective, Plaintiff specifically denied side effects from pain medications on several occasions.  *See id.* at 143, 172.

An ALJ may consider the claimant's lack of medication or lack of strong medication in finding that allegations of disabling pain are not credible.  Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (explaining ALJ properly discounted complaints of disabling pain where, among other factors, claimant took only aspirin, Motrin, Tylenol, and Darvocet).  Here, the records show Plaintiff went for long periods of

---

[10]  Plaintiff suggests in her memorandum that she spoke "from experience, as prior to the end of her health insurance, she was taking various medications including Percocet, Lortab, Valium, Skelaxin, steroids, Lyrica, and injections for pain," referencing the record at 205 (2006), 213 (2006), 215 (2006), 225 (2004), 233 (2006), and 375 (2009).  Doc. 16 at 14.  However, these patient notes do not reflect Plaintiff's concerns.

time without taking any pain medication and, at other times, she took only Tylenol and BC powder for pain.  *See* R. 19-24, 41, 44-46, 55-56, 143, 172, 187, 197, 201, 274, 361-62, 364-68, 370-75, 381-90.

After reviewing all of the relevant medical evidence of record, including Plaintiff's testimony regarding her pain, *id.* at 19-21, 24, the ALJ did not find "it credible to believe that an individual with chronic back pain of the severity the claimant has alleged would not seek medication that may provide pain relief."  *Id.* at 24.

Plaintiff also argues that the ALJ improperly considered that Plaintiff drove a car. Doc. 16 at 15.  Prior to the hearing and at hearing, Plaintiff described her limited driving and problems associated with driving for any prolonged period.  *See, e.g., id.* at 24, 49, 54, 144, 149.  The ALJ recounted "that [Plaintiff] is able to drive a motor vehicle and did so frequently for up to 30 miles a time."  *Id.* at 24.  The ALJ also noted Plaintiff describing "a restricted range of activities of daily living."  *Id.* at 23; *see id.* at 47-56.  The ALJ did not err in considering Plaintiff's daily activities, including driving a car for limited distances, when assessing her subjective allegations of pain.  *See generally* Macia, 829 F.2d at 1012; 20 C.F.R. § 404.1529(c)(3)(i).

The ALJ's credibility determinations of Plaintiff are supported by substantial evidence.

## C.  ALJ's RFC Determination

At the fourth step of the sequential evaluation process, the ALJ must assess the claimant's RFC.  20 C.F.R. § 404.1520(a)(4)(iv)-(v).  The RFC represents the most the claimant can do despite her credible impairments and it is based upon all of the relevant

medical and other evidence in the record.  20 C.F.R. § 404.1545(a)(1).  The ALJ should
also evaluate the medical source opinions in assessing the RFC.  20 C.F.R.
§ 404.1527(b).  Medical source opinions are statements from physicians and
psychologists that reflect judgments about what the claimant can still do despite her
impairments.  *Id.*  Several factors should be considered including the treatment and
examining relationship between the claimant and the physician, the extent to which the
medical sources opinion is supported by medical signs and laboratory findings,
consistency of the opinion to the evidence of record as a whole, whether the medical
source is a specialist, and any other relevant factors brought to the ALJ's attention.
20 C.F.R. § 404.1527(c)(1)-(6).

Plaintiff generally argues that the ALJ failed to explain the weight assigned to
various medical opinions in the record and failed to explain the basis for her RFC
finding.  Doc.16 at 12-13.  (This argument is made in the same section as her argument
regarding Listing 1.04A and B.  *Id.*)

In assessing Plaintiff's RFC, the ALJ found that Plaintiff's credible impairments
allowed her to perform a limited range of work.  R. 23.  Specifically, the ALJ found that
Plaintiff has the RFC to perform light work as defined in 20 CFR § 404.1567(b):

> during a normal 8-hour workday, she can lift/carry 20 pounds occasionally and 10
> pounds, frequently; [s]he can sit for up to 6 hours and stand/walk for up to 6
> hours in an 8-hour day, with an opportunity to change positions within her
> workstation, as needed; she can occasionally perform overhead reaching
> functions with her right upper extremity and can do so without limitation with her
> left upper extremity; she occasionally can climb stairs and ramps, but not ropes,
> ladders or scaffolds; she can occasionally balance, stoop, kneel, crouch or crawl;
> hazards, such as heavy operating machinery and unprotected heights, should
> [be] avoided; she is limited to routine, uncomplicated work tasks due to pain.

*Id.* at 23.

The ALJ's RFC findings are consistent with the medical evidence discussed by the ALJ. *See id.* at 19-24.  The ALJ based the RFC findings upon the reports and opinions of Plaintiff's examining and treating physicians, Drs. Voss, Downing, Woodham, Magee, Ayala, Ostrov, and Mullin.  *See, e.g., Id.* at 19-24, 226-47, 268, 361-62, 370-75, 381-90.  These findings show Plaintiff recovered from her three surgeries in the fall of 2006 and generally required no medical treatment for more than two years after the surgeries, other than a follow-up examination in February 2007 when it was noted that Plaintiff still had soreness of the lower back, although her severe hip and leg pain resolved since surgery, and an emergency-room visit following the motor-vehicle accident in August 2007.  *Id.* at 19-21.

It was not until April 2009, when Plaintiff sought urgent care treatment (from Dr. Magee) after 4 or 5 days of back muscle spasms with a flare up of sciatica symptoms.  *Id.* at 21, 25, 361-62.  Thereafter, Plaintiff received diagnostic tests, including an MRI and EMG, and was examined by Drs. Ayala and Mullin.  The ALJ discusses the patient notes of these doctors.  *Id.* at 21, 24-25.

Plaintiff argues that the ALJ's discussion of the weight assigned to medical source opinions is confusing and therefore it is "nearly impossible" to determine the weight given to specific opinions or evidence.  Doc. 16 at 12.  The ALJ analyzed each medical opinion in the record and the treatment reports and opinions of Plaintiff's examining and treating physicians, *id.* at 19-24, and accorded greater weight to the

reports and opinions of Plaintiff's examining and treating physicians, *except* Dr. Mullin's opinion on Listing 1.04A.  *Id.* at 19-24.  The ALJ also gave greater weight to the opinions of consultative examiner's Carla M. Holloman, D.O. and Lawrence V. Annis, Ph.D.  *Id.* at 24, 269-73, 274-78.  Yet, the ALJ accorded little weight to the state-agency medical and psychological opinions because other opinions were more consistent with the record as a whole.  *Id.* at 20-21, 24-25, 279-300, 315-336.  (The ALJ expressly reviewed the state-agency opinions and identified them by exhibit number.  *Id.* at 20-22, 279-300, 315-336.)

Plaintiff also argues that the ALJ did not "explicitly" state the weight given to Dr. Mullin's opinion included in his examination notes that Plaintiff could not perform a job requiring bending, lifting, or prolong standing or walking, *id.* at 375.  Doc. 16 at 12. The ALJ described Dr. Mullin's notes, including this opinion, and explicitly stated that she accorded "greater weight" to Dr. Mullin's treatment notes and this opinion.  *Id.* at 21, 22, 24, 375.  The ALJ, in her hypothetical questions posed to Mr. Dolan, *id.* at 60-65, and in her ultimate RFC findings, *id.* at 23, included restrictions in the RFC that accounted for limitations of lifting, sitting, standing and walking which were consistent with the medical record.[11]

---

[11]   Mr. Dolan opined, in part, that a person as described by the ALJ in the hypothetical, could perform the jobs of office helper, ticket seller, and mail clerk, all unskilled jobs (each with a SVP of 2) and light exertional occupations, within the work station with the added condition that they are able to change positions as needed during the work that might be every 20 minutes or the time necessary to take a stretch break. *Id.* at 63.  This opinion supports the ALJ's finding that Plaintiff can perform these jobs if afforded "an opportunity to change positions within her work station, as needed."  *Id.* at 23.  Plaintiff does not argue that these jobs would not allow for this accommodation.

The light work limitation is a significant restriction that accounts for the Plaintiff's physical limitations and demonstrates that the ALJ gave some credit to the opinion of Dr. Mullin where the opinion was supported by objective medical evidence.  *See* Choate v. Barnhart, 457 F.3d 865, 866-70 (8th Cir. 2006) (describing light work with environmental restrictions as "significant limitations" demonstrating some credit was given to the opinions of the treating physician); 20 C.F.R. § 404.1567(b) (describing the nature of light work).

**V.  Conclusion**

Plaintiff has the burden to prove she is disabled.  Moore, 405 F.3d at 1211.  The record does not support Plaintiff's assertion that she was disabled that is, she was unable to engage in any substantial gainful activity due to a medically determinable impairment that can be expected to last for a continuous period of not less than 12 months.  *See* 42 U.S.C. §§ 416(i) and 423(d)(1)(A).

Considering the record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly followed the law.

Accordingly, pursuant to the fourth sentence in 42 U.S.C § 405(g), the decision of the Commissioner to deny Plaintiff's application for Social Security benefits is **AFFIRMED** and the Clerk is **DIRECTED** to enter judgment for the Defendant.

**DONE AND ORDERED** at Tallahassee, Florida, on July 30, 2012.

s/    **Charles A. Stampelos**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**